Perlita Josefina Javier **RADOVAN**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE**, Respondent.

No. 99–71089.

INS No. A72 669 342.

United States Court of Appeals, Ninth Circuit.

Submitted June 7, 2001 *.

Decided June 28, 2001.

---

\* The panel finds this case appropriate for submission without oral argument pursuant to Fed. R.App. P. 34(a)(2).

Before PREGERSON, HENRY,** and HAWKINS, Circuit Judges.

MEMORANDUM ***

Based on the evidence in the administrative record, we conclude that Radovan has presented evidence "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution," *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), necessary for asylum eligibility, 8 U.S.C. § 1101(a)(42)(A).

Radovan testified before the Immigration Judge that she comes from a military family and was a member of the Philippines Air Force. One of her brothers, a police captain, was assassinated, likely by a guerrilla group known as the New People's Army ("NPA"). Another brother, an army captain, was repeatedly threatened and harassed by the NPA. Radovan herself was visited in the middle of the night, soon after her brother's assassination, by men in military uniforms she believes were members of the NPA. Rather than face these men herself, Radovan had another brother convince them she was not at home. She left the Philippines for the United States soon after that evening.

The Board of Immigration Appeals ("BIA") denied Radovan's application for asylum because, it felt, there is no objective basis for Radovan's fear that she will be persecuted by the NPA if forced to return to the Philippines. In making this finding, the BIA discounted Radovan's tes-

timony of the late night visit because she "never confirmed that the men were actually NPA guerrillas." However, Radovan did testify that the day after the late night visit she asked her commanding officer if any legitimate military personnel were sent to her home the night before, and was told that there would be no reason for military personnel to visit her home at such an hour. Radovan also testified that NPA members are known to disguise themselves in normal-looking military clothing.

Having determined that the uniform-clad men were likely not legitimate, and certainly had not been sent by her superiors, we are at a loss as to what more Radovan should have done to determine that the late night visitors were indeed NPA. These guerrillas had just recently assassinated her brother—it is understandable that Radovan did not want to present herself to the men and that the brother who interacted with them did not ask for identification. Radovan and her brother were presented with a potentially deadly situation, which they acted to disarm as quickly as possible. The BIA's decision to find fault with Radovan's actions before or after the late night visit was not reasonable—there is nothing more Radovan could have been expected to do to confirm that the visitors were NPA other than make sure they were not legitimate military, which she did at the earliest safe opportunity.

The BIA also stressed that the situation in the Philippines has changed regarding the NPA since Radovan's departure. To support this position, the BIA cited a June 1995 State Department country report, arguing that the report shows a weaker, more diluted NPA. We cannot agree with

** Honorable Robert H. Henry, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation.

*** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

this view. As Judge Trott wrote for the en banc court:

> The New People's Army ... is a violent, revolutionary Communist group which actively opposed the Philippine government. The NPA has a well-documented history of political violence, including the murder of its opponents. The 1995 Country Profile [country report] issued by our State Department says "the NPA ... is known to engage in killings and other violence."

*Borja v. INS*, 175 F.3d 732, 732 (9th Cir. 1999) (en banc). Thus, our precedent clearly takes a decidedly less rosy view of the NPA, as depicted in the very same 1995 country report relied on by the BIA for its opposite conclusion. *Borja* confirms what Radovan testified to: the NPA is a dangerous, violent guerrilla group. The BIA's decision to hold otherwise was unreasonable.

The only other factors cited by the BIA cutting against an objective basis finding were (1) that Radovan's father, a thirty-year military veteran, continued to live in the family home for five years after Radovan's emigration until his natural death and (2) that Radovan has three brothers who continue to live in the Philippines. However, it would be unreasonable to base a no objective basis finding on these two facts alone.

Radovan's father was an elderly man, retired from the military. Notwithstanding his military history, the father's situation was quite different from Radovan's, who remained active military. In considering Radovan's siblings, it is important to compare apples to apples. Radovan has six brothers, but, so far as the record reveals, only three of them have served in the military or police. One of these brothers was assassinated, one emigrated to the United States through a U.S. citizen spouse because he was being threatened, and one has lived continuously in the Philippines. That one brother has chosen to remain in the Philippines does not render Radovan's fear unfounded—of the military or police siblings who have not emigrated, one of two has been assassinated. This fact, coupled with the nature of the NPA, the threats received by Radovan's brother who emigrated, and the highly suspicious late night visit to her home, makes this case so compelling as to require a grant of asylum. *Elias–Zacarias*, 502 U.S. at 483–84, 112 S.Ct. 812.

PETITION FOR REVIEW GRANTED.